Thomas H. O'LEARY, et al.,
Plaintiffs/Respondents,

v.

Charles E.H. LUEDDE, et al.,
Defendants/Appellants.

No. ED 76084.

Missouri Court of Appeals,
Eastern District,
Division One.

June 6, 2000.

John William Moticka, Stinson, Mag & Fizzell, St. Louis, for appellant.

James F. Mauze, Ottsen, Mauze & Leggat, L.C., Clayton, for respondent.

*OPINION*

JAMES R. DOWD, Judge.

Charles and Jane Luedde appeal from a judgment granting summary judgment in favor of Thomas and Cheryl O'Leary. We reverse and remand.

*Facts*

In August of 1997, the Lueddes decided to sell their home on 750 Cella Road in St. Louis County, Missouri. They retained a real estate agent and prepared a statement which included the following disclosures:

MISCELLANEOUS...

(*l*) Are you aware of any:

-shared or common features with adjoining properties? (X) Yes ( ) No

-rights of way, unrecorded easements, or encroachments which affect the property? (X) Yes ( ) No...

Explain any "yes" answer you gave for ... (*l*) above: See Annotations

The Annotations contained the following:

Sewerage

The Sewer line drains to the north of the house approximately 80 feet to a septic tank which is located on what is now the back yard/garden of the house at # 748 Cella Road and then discharges through the septic tank to Cella Road sewer lines and then into MSD lines to the south.... Notwithstanding the discharge into the sanitary sewer lines, we are told that the septic tank should be checked, emptied and cleaned at five year intervals – last done in the spring of 1996.

The disclosure statement makes it clear that the septic tank and sewer lines serving 750 Cella Road were located on 748 Cella Road.

The Lueddes decided to open the house to real estate agents and their clients on September 7, 1997. The O'Learys, through their own agent, requested permission to view the house before that date and were refused. Cheryl O'Leary viewed the house on September 7. That night, she and her husband offered the full asking price of $939,000. The offer included $50,000 of earnest money and required the Lueddes to accept within one hour.

The offer was submitted on a preprinted form with an addendum prepared by the O'Learys. The preprinted form included an acknowledgement that the O'Learys had read a copy of the Lueddes' disclosure statement for the property. The Lueddes' disclosure statement made it clear that it was not a substitute for any inspection that O'Learys wished to obtain, and it advised the O'Learys to address any concerns they had about the statement though contingencies in the contract.

The offer also contained a paragraph entitled "Building, Termite and Environmental Inspections." This provision included the following language:

Within fifteen (15) days after "Acceptance Deadline" date, Buyer, at his option and expense, may obtain written inspection reports from a qualified and reputable engineer, contractor or home inspection service of the property and improvements *limited to* structural defects, environmental hazards, termite or other type of infestation and damage, plumbing, wells and sewer systems and equipment, roof, heating, and/or air conditioning systems and equipment, electrical systems and equipment, swimming pool and equipment, exterior drainage, basement leaks and mechanical equipment including appliances, and shall furnish a copy thereof to Seller or listing agency stating in writing any defect unacceptable to Buyer....

...

...Buyer and Seller have ten (10) days after date of receipt of the report by Seller or listing agency in which to reach an agreement in writing as to who will complete and pay for the correction of the defects, or as to an agreed monetary adjustment at closing in lieu of correction of defects.... If no written agree-

ment is reached within said ten (10) days, this contract is terminated and the earnest deposit is to be refunded to Buyer.

The Lueddes accepted the O'Learys' offer within the hour. The O'Learys' offer, combined with the Lueddes' acceptance and the deposited earnest money, created a contract for sale of the house.

On September 19, the O'Learys delivered a notice to the Lueddes listing several "defects... unacceptable to Buyer." In this notice, the O'Learys raised concerns about the ownership and the right to maintain the septic tank. In a letter dated September 22, the Lueddes informed the O'Learys that the owner of the house had a recorded easement and an easement by implication that covered the use and maintenance of the septic tank. In a letter dated September 25, the Lueddes stated that they had been advised that the title company would "provide an affirmative endorsement in the title commitment and policy relating to the existing easement." In a second letter dated September 25, the Lueddes offered to share the cost of bypassing and abandoning the septic tank. On September 26, 1997, the Lueddes wrote the O'Learys' counsel and informed him that the title company had discovered "a recorded easement in favor of 750 Cella Road against 748 Cella Road... for the sewer line/septic tank."

In response, the O'Learys demanded the Lueddes absorb the entire cost of bypassing the septic tank and certify that it had been done correctly. The Lueddes refused to do so. On September 30, 1997, the O'Learys informed the Lueddes that the contract was terminated.

The contract included a provision entitled "Remedies Upon Default." It provided that "[i]f the default is by Buyer, Seller may either accept the earnest money as liquidated damages and release Buyer from the contract (in lieu of making any claim in court), or may pursue any remedy at law or in equity." Rather than pursue other remedies, on October 1, 1997, the Lueddes informed the O'Learys in a letter that they would retain the earnest money deposit unless the O'Learys withdrew their notice of termination.

On October 14, 1997, the O'Learys filed this lawsuit. They sought a declaration that the parties' contract was terminated, the return of their earnest money deposit, and attorney's fees. The Lueddes filed an answer and counterclaim seeking dismissal of the petition, the forfeiture of the earnest money, and attorney's fees. The parties later filed cross-motions for summary judgment. The trial court granted the O'Learys' motion for summary judgment and denied the Lueddes' motion. It then entered its judgment and order, awarding the O'Learys $24,000 on their motion for attorneys' fees. The Lueddes appeal.

### Analysis

■ In addition to the granting of the O'Learys' motion for summary judgment, the Lueddes appeal from the denial of their own motion for summary judgment. The denial of summary judgment is not a final judgment and is not an issue for appeal.[1] This is true even if error is alleged in contemporaneously granting summary judgment in favor of the other party.[2] Because we discern no extraordinary circumstances to vary from that rule, we decline to review the Lueddes' claim that the trial court erred in denying their motion for summary judgment.

### Standard of Review

Appellate review of summary judgment is de novo. We review the record in the light most favorable to the party against

---

1. *Missouri Property and Cas. Ins. Guar. Ass'n v. Petrolite Corp.,* 918 S.W.2d 869, 871 (Mo. App. E.D.1996); *Gorman v. Farm Bureau Town & Country Ins. Co. of Missouri,* 977 S.W.2d 519, 527 (Mo.App. W.D.1998).

2. *Id.*

whom judgment was entered and accord the non-movant the benefit of all reasonable inferences from the record.[3] In order for summary judgment to be proper, the movant must show a right to judgment flowing from facts about which there is no genuine dispute. Summary judgment tests simply for the existence, not the extent, of genuine disputes. Summary judgment is not proper if the trial court must overlook material in the record that raises a genuine dispute about facts underlying the movant's right to judgment.[4] A genuine dispute is one "that is real [and] not merely argumentative, imaginary or frivolous."[5]

I. Septic Tank

The inspection clause granted the O'Learys the power to terminate the contract if there was an undisclosed defect unacceptable to the O'Learys. But first the O'Learys had to obtain a written inspection report "from a qualified and reputable engineer, contractor, or home inspection service" documenting the existence of the defect. If the O'Learys had presented a report to the Lueddes, the parties had ten days to reach an agreement to complete and pay to correct the defect. If no agreement was reached within that time, the contract would be terminated automatically and the earnest money would be returned to the O'Learys.

There is nothing in the record of an inspection report listing a septic tank defect. The building inspection did not cover the septic system. The O'Learys did at some point obtain and furnish a bid from a plumber to bypass the septic tank, which reads in its entirety:

September 18, 1997

Plumbing Quote

Project: 750 Cella

Price to bypass septic tank, provided there is an easement, and locate [stop] box: $9,800.00

Nancy–          9/22/97

    App.    $400 to locate

    "          $9400 to bypass septic tank –
    more to fill tank or physically remove

          -Jim

The bid does not list any defect with the septic tank. In their notice to the Lueddes, the O'Learys refer to the septic tank, but do not claim it was defective. Rather, they raise concerns over the ownership of the tank and the right to maintain it. Because of the lack of a written inspection report listing a defect with the tank, the unacceptable defect procedure set out in the contract was never brought into play.

█    In addition, the septic tank and its location on the neighbor's yard is listed on the Lueddes' disclosure statement. This disclosure precludes the O'Learys' claim that they did not know of the septic tank when they submitted their offer. The purpose of inspection provisions in real estate sales contracts is to give the buyer the opportunity to have the property inspected by someone who is trained and able to discover undisclosed and hidden defects. As this Court noted in *Gordon A. Gundaker Real Estate Co., Inc. v. Maue:*

> Any rational, untrained buyer of a house is concerned about hidden defects in the house; i.e. defects which the buyer, because of a lack of training, cannot discover by reasonable inspection…. Thus, the form sales contract in issue provides the buyer the right to engage a qualified person to inspect the house for hidden defects. If a buyer properly informs the seller of a hidden defect found by the buyer's expert and the seller does not

---

**3.** *ITT Commercial Finance Corp. v. Mid–America Marine Supply Corp.,* 854 S.W.2d 371, 376 (Mo.banc 1993).

**4.** *Id.* at 378.

**5.** *Id.* at 382.

remedy it, the buyer has the privilege of terminating the contract.[6]

⬛ There is a genuine dispute as to whether the septic tank constituted a hidden defect. The O'Learys direct our attention to a letter of February 16, 1998 from the owners of 748 Cella Rd., the subservient estate upon which the alleged easement rests. In that letter the neighbor, Mr. Armstrong, stated that the septic tank has overflowed from time to time, oozing unsanitary waste and emitting foul odors; and that the easement in question does not include the right to maintain a septic tank. In addition, he demanded that the Lueddes render the tank inoperative and instead hook-up to the municipal sewer lines. This letter was attached as an exhibit to the O'Learys' verified response to defendants' motion for summary judgment.

Mr. Luedde then filed a supplemental affidavit in support of the Lueddes' motion for summary judgment and in opposition to the O'Learys' motion for summary judgment. The supplemental affidavit controverted all of Mr. Armstrong's assertions and further stated that Mr. Armstrong's letter, which he claimed to have received six months after he prepared the disclosure statement, was the first that he had heard of the Armstrongs' complaints with the septic tank. Finally, the O'Learys filed the affidavit of Mr. Armstrong realleging all of the facts contained in his letter of February 16, 1998, as a supplement in support of their motion for summary judgment and in opposition to defendants' motion for summary judgment. These statements create questions of fact as to whether the septic tank is defective, and, if so, whether that defect was sufficiently disclosed to the O'Learys. Therefore, summary judgment is not appropriate.

## II. Termites

The O'Learys also contend they could terminate the contract because of termite damage in the property's unattached garage. The inspection provision allows the O'Learys to terminate the contract only if no agreement is reached regarding who will complete and pay for the correction of the defect. The Lueddes disclosed the prior existence of termites in their disclosure statement and eventually offered to arrange to have the garage retreated.

In the disclosure statement, the Lueddes explained:

> The garage which was replaced in 1987 had severe termite damage. Due to moisture affecting the new garage, there was a reappearance of termites which has been treated successfully prior to any structural damage, however the area should be checked regularly.

Under the terms of the contract, as discussed above, the O'Learys had the option of obtaining a termite inspection report. If the report listed any termite infestation and damage, the two parties had ten days after the O'Learys gave the report to the Lueddes to agree on who would complete and pay for the correction of the defects.

The O'Learys contacted Stopke Pest Control to inspect the property. Stopke assessed the presence of termites and termite damage as follows:

> During the inspection of the unattached garage no live termites were found in areas accessible to visual inspection. The following signs of termites were found:
>
> -Damage was found on the siding to the right of the garage door.
>
> -Twelve feet of termite mud tunnels were found to the left of the garage door frame.

The owner stated the R & B treated the garage for termites, however, no drill hole patches were found to substantiate

6. *Gordon A. Gundaker Real Estate Co., Inc. v. Maue*, 793 S.W.2d 550, 552 (Mo.App. E.D. 1990).

this. If it cannot be substantiated that the garage was treated, we would recommend treatment as described on the attached bid sheet.

The attached bid sheet quoted $410 to treat the garage for termites.

On September 19, 1997, the O'Learys furnished the inspection report to the Lueddes and demanded that they either provide documentation detailing the prior termite treatment or undertake the repairs recommended in the report. On September 29, 1997, the Lueddes informed the O'Learys that "although no current indication of active termites is reported, we will arrange for retreatment against termites in and surrounding the garage... and furnish the report relating to such treatment to the Buyer."

As explained above, the purpose of the inspection provision in the contract is to allow a buyer the right to engage a qualified person to inspect the house for hidden defects, i.e., defects an untrained buyer cannot discover through a reasonable inspection.[7] In *Gundaker*, the buyers also hired Stopke Pest Control to inspect the house being sold for termites. In its report, Stopke stated that there were no visible signs of infestation and that the seller told Stopke that the house had been pretreated for termites. The buyers requested proof of pretreatment. When the sellers did not provide this, the buyers terminated the contract.[8] At the *Gundaker* trial, the president of Stopke testified that proof of pretreatment was a critical condition of his company's inspection report.[9]

■ In *Gundaker*, this Court held that the buyers were entitled to terminate the contract because the sellers failed to provide the proof of pretreatment as requested by the buyers.[10] Likewise, in this case, the Lueddes did not provide any documentation that the termite infestation in the garage had been treated. Our facts divert from *Gundaker*, however, in that the O'Learys demanded either this documentation *or* that the Lueddes arrange to have the garage treated as recommended in the inspection report. Within the ten days provided by the contract for the two sides to come to an agreement, the O'Learys consented to have the garage retreated. At the very least, a genuine issue of fact remains as to whether the Lueddes and the O'Learys agreed on who would complete and pay for the termite treatment. Summary judgment based on the termite inspection is consequently not proper.

III. Title Defect

The O'Learys also claim that the contract's title provisions gave them a right to terminate the contract. The addendum attached to the contract governs by its terms despite any contrary terms in the contract. This addendum provides:

Buyer agrees to order title examination within fifteen (15) days after acceptance deadline date of Contract. Seller agrees to transfer to Buyer *at closing* title that is marketable to Buyer. In the event Seller is unable to perfect title or provide title that is marketable to Buyer *by closing,* Buyer shall have the right to terminate the contract.... (emphasis added).

They argue that the easement for the septic tank did not include the tank itself, but only included the sewer line, water line, and gas line and did not include the right to repair, maintain or replace the tank. They also argue that even if there was an easement, the title company did not agree to insure it. Conversely, the Lueddes contend that there was an easement and that the title company agreed to insure it.

■ However, according to the terms of the contract, even assuming some defect in

7. *Id.*

8. *Id.* at 551–552.

9. *Id.* at 552.

10. *Id.* at 553.

title, the O'Learys could not instantly terminate the contract. The addendum to the contract specifies that the Lueddes had until closing to deliver marketable title to the O'Learys. The O'Learys informed the Lueddes that they were terminating the contract almost a month and a half before the scheduled closing date. A genuine dispute exists as to whether the Lueddes had the opportunity to correct the defect in title by closing, as was their right under the contract. Consequently, the title defects provisions of the contract and its addendum do not provide grounds for summary judgment.

### Conclusion

■ Because the Lueddes fully disclosed the location of the septic tank and the previous existence of termites in the garage, the O'Learys are not entitled to summary judgment. Further, the contract expressly grants the Lueddes the right to retain the earnest money deposit in the event of a default by the O'Learys. Whether the O'Learys defaulted on the contract is a question for trial.

In view of the February 16 letter from Mr. Armstrong, genuine disputes exist concerning the contract. Therefore, there can be no summary judgment for the O'Learys. The order granting summary judgment for the O'Learys is reversed. The order awarding attorney's fees to the O'Learys is also reversed. The O'Learys' motion for attorney's fees and costs on appeal is denied. This case is remanded to the trial court for proceedings consistent with this opinion.

GARY M. GAERTNER, P.J., concurs.

PAUL J. SIMON, J., concurs.